**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1553 MDA 2018 |

Appeal from the Decree Entered August 17, 2018
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
4306

BEFORE:   PANELLA, P.J., MURRAY, J., and PELLEGRINI*, J.

MEMORANDUM BY MURRAY, J.:                **FILED FEBRUARY 13, 2019**

R.M., Jr. (Father) appeals from the decree involuntarily terminating his parental rights to his minor child, H.M.M. (born March 2017) (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b) of the Adoption Act.[1]  After careful review, we affirm.

We adopt and summarize the trial court's recitation of the facts, which is supported by the record.  **See** Trial Court Opinion, 10/16/18, at 2-9.  We note, briefly, by way of background, the following.  Centre County Children and Youth Services ("CYS") has been involved with the family since 2010, when Mother became pregnant with R.M., the couple's first child.  CYS caseworkers attempted to engage parents in preventative services, due to the fact that Father was a registered sex offender with convictions for sexual

---

[1] That same day, the court terminated the parental rights of L.M. (Mother). Mother has not appealed the termination of her parental rights.

---

*   Retired Senior Judge assigned to the Superior Court.

assault, aggravated indecent assault, two counts of indecent assault, and two counts of corruption of minors. While parents participated briefly with in-home parenting services, they eventually refused further assistance.

Following R.M.'s birth in July 2010, she was immediately taken into emergency custody by CYS caseworkers. In addition to Father's convictions, there were concerns regarding Mother's physical and cognitive disabilities, and her failure to acknowledge the potential risk to R.M. posed by Father. Despite the entry of an aggravated circumstances order against Father, because Father lived with Mother, he was allowed to participate in reunification services along with Mother.

At that time, the services consisted of parenting education sessions and individual and family sessions. Mother was not able to prepare bottles or change diapers without direction from another adult, and required assistance handling R.M. and understanding her needs. Mother was unable to retain this information even when it was carefully explained to her. With regard to Father, caseworkers had significant concerns regarding his mental health and stability, his failure to appropriately manage his seizure disorder, and his failure to take prescription medications to treat his anger and mood disorders.

Reunification services were provided for approximately twelve months, but, after parents' failure to make significant progress, services were discontinued and a petition to involuntarily terminate Father's and Mother's parental rights with respect to R.M. was filed. Rather than having their rights

involuntarily terminated, Mother and Father voluntarily relinquished their parental rights to R.M., who was later adopted by her foster family.

In September 2015, CYS caseworkers learned that Mother was pregnant with a second child. Ongoing assessments by caseworkers revealed that little had changed regarding parents' situation. Parents were living with the child's maternal grandparents ("Maternal Grandparents"), but based upon caseworkers' assessments of the interactions between parents and Maternal Grandparents, there were no adults in the home who could ensure the safety of a child.

S.A.M., born in March 2016, was immediately taken into emergency custody by CYS caseworkers. S.A.M. was placed into kinship foster care in the same home as her older sister, R.M. Following the filing of a dependency petition, S.A.M. was adjudicated dependent, and her placement goal identified as adoption. That same day, an aggravated circumstances order was entered against Father due to his prior convictions for sexual offenses against minors, status as a sexually violent predator, and related registration and reporting requirements. Reunification services were not provided to Father, although he and Mother were allowed supervised visitation with S.A.M.

Both parents struggled, during visitation with S.A.M., to provide for her needs and accomplish basic child care tasks, including changing her diaper and clothes, recognizing her needs, and feeding her. Additionally, in October 2016, Father advised CYS caseworkers that he had stopped treating with his sex offender counselor at Project Point of Light, and would begin seeing a new

counselor. However, he refused to sign a release to allow CYS to gain more information regarding his treatment.

While S.A.M.'s case was still pending, CYS caseworkers received a referral that Mother was pregnant with a third child. However, both Mother and Father repeatedly denied that Mother was pregnant. Parents canceled a March 2017 visitation with S.A.M., claiming that Mother was scheduled to have a tubal ligation at Hershey Medical Center. However, Hershey Medical Center then informed CYS caseworkers that Mother had given birth to Child through a scheduled Cesarean section. Shortly after Child's birth, CYS caseworkers took her into emergency custody, and she was placed in kinship foster care with her biological sisters.

On March 21, 2017, CYS filed a petition to terminate Mother's and Father's parental rights with regard to S.A.M. The petition was eventually granted, following a hearing, on January 17, 2018.[2] With regard to Child, she was adjudicated dependent in March 2017, and her permanency goal was established as adoption. An aggravated circumstances order was once more entered against Father. Parents were offered bi-weekly visits for one hour, separate from visits with S.A.M., but parents chose to visit both children at the same time.

_____

[2] Both Mother and Father appealed the termination of their parental rights, and this Court affirmed the termination decrees. *See In re S.A.M.*, 195 A.3d 1026 (Pa. Super. 2018) (unpublished memorandum).

In March 2018, CYS filed petitions to terminate Mother's and Father's parental rights to Child. The court convened a hearing on the petitions on August 14, 2018. Father, represented by counsel, testified on his own behalf. Child was represented by Parviz Ansari, Esquire, as legal counsel.[3]

Elena Taylor, CYS caseworker, testified that, since Child's placement, Father's sex offender counseling attendance has remained inconsistent. As noted above, for some time he refused to sign necessary release forms. Following Child's birth, Father did sign a release, but then ceased treating with that counselor. The counselor informed caseworkers that he had seen Father on seven occasions, but had not received any information from Father's previous counselor. Subsequently, Father informed caseworkers he had returned to Project Point of Light, but once more refused to sign a release. Additionally, Father was not managing his seizure disorder, and continued to suffer from seizures. Father refused to release information to caseworkers regarding his medical treatment or whether he had received a clearance from his doctor that he was able to safely hold Child.

Visitations with Child continued to show the same issues that Father had had in visitation with R.M. and S.A.M., namely, that he was not able to

_____

[3] Attorney Ansari had been appointed as both legal counsel and guardian *ad litem* for Child. **See** N.T., 8/14/18, at 5. He represented to the court that, given the young age of the child, there was no conflict between Child's legal and best interests. **Id.**; **see also In re T.S.**, 192 A.3d 1080 (Pa. Super. 2018) (noting that where there is no conflict between child's best and legal interests, a guardian *ad litem* may serve dual roles and still satisfy the child's statutory right to counsel in involuntary termination proceedings).

understand when Child was hungry, tired, or needed a diaper change. Further, due to his seizure disorder, Father could not hold Child. Parents had not stabilized their living situation; between June 2017 and August 2018, they lived in a shelter in Tyrone, Pennsylvania; in Altoona, Pennsylvania with maternal grandparents; and planned to move to Osceola Mills, Pennsylvania, in the early fall.

Ms. Taylor further testified that Child is doing well in her foster home, is on track developmentally at the time of the hearing, and is walking and talking. Child is strongly bonded with her foster mother, and looks to foster mother for support instead of her biological parents. Child refers to foster mother as "mama" or "mom." Additionally, Child is placed with her two biological siblings and is bonded with them as well. Ms. Taylor believed that the termination of Father's parental rights would allow Child the opportunity for permanency, would not have a detrimental impact on Child, and was in Child's best interests.

Father testified that he denied Mother's pregnancy because he did not believe it himself. Father claimed he was reluctant to sign releases of information for CYS because he had previously had his identity stolen and had "gotten weird letters in the mail." Father claimed he was attending counseling, and asserted that his lapses in attendance were due to his inability to receive medical rides. Father denied that he and Mother were incapable of caring for Child, although he admitted he had never spent any time alone with Child. Father also contended that his sister should be considered as an adoptive

resource, though she had never been presented as a resource prior to the termination hearing.

At the conclusion of testimony, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b). Father timely appealed and filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

> 1. Did the trial court incorrectly find clear and convincing evidence existed to terminate Father's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(2), (5), and (8) where no assessment[] was conducted, but instead the Agency merely relied on the lack of progress Father made in a prior case years before?
>
> 2. Did the trial court incorrectly determine that sufficient evidence was presented to terminate Father's parental rights?[4]

**See** Father's Brief at 2 (unnecessary capitalization and suggested answers omitted).

---

[4] Father's statement of errors complained of on appeal phrases this issue, "The [trial court] erred in terminating Father's parental rights where insufficient evidence was presented to meet the requirements of the grounds submitted." **See** Pa.R.A.P. 1925(b), 9/14/18, at 1. As Father does not state clearly that he is challenging the court's Section 2511(b) findings, he risks waiver of this issue. **See Krebs v. United Ref. Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); **see also In re Adoption of R.K.Y.**, 72 A.3d 669, 679 n.4 (Pa. Super. 2013) (declining to address subsection 2511(b) where the appellant did not make an argument concerning that subsection). However, as discussed *supra*, even if not waived, this argument is without merit.

We review cases involving the termination of parental rights according to the following standards.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

> Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). As CYS argues that it proved by clear and convincing evidence that grounds for termination existed under 23 Pa.C.S.A. § 2511(a)(2), we focus our analysis on subsection (a)(2) and (b).

- 8 -

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of Section § 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern

parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

Here, Father argues that the orphans' court erred in granting the petition and terminating his parental rights because CYS did not prove the presence of the conditions leading to termination at the time the petition was filed, but relied on evidence from years earlier. *See* Father's Brief at 6-7. Father argues that, despite the entry of an aggravated circumstances order against him, he was entitled to reunification services because he was provided such services during the pendency of R.M.'s dependency. *Id.* at 7. Father argues that, because CYS failed to offer reunification services, the agency was not in a position to adequately determine the abilities or deficiencies of Father relative to Child. *Id.* at 8.

Father raised this same issue in his appeal from the termination of his parental rights to S.A.M. In that case, a prior panel of this court observed that:

> Father claims that the finding that termination was proper under Section 2511(a) was based on information from Father's involvement with CYS with a prior child and that CYS failed to present evidence that he has current inability to parent Child. We disagree.
>
> Here, the trial court found aggravated circumstances as to Father based on his convictions. Aggravated Circumstances Order, filed March 17, 2016; *see* 42 Pa.C.S.A. § 6302 (defining aggravated circumstances). The trial court further found that CYS need not engage in reasonable efforts to reunify Father and Child. *See* Aggravated Circumstances Order.

The trial court noted that the "record is replete with testimony that most all of the concerning circumstances and conditions existing when services were provided for R.M. continued to exist on the birth of S.A.M. and thereafter." TCO at 13. The trial court reasoned that termination was proper, in part, because Father refused to cooperate with CYS by not providing information regarding his psychological and medical treatment, "despite many concerns about his mental and physical conditions and how those conditions impact his ability to parent." *Id.* at 12. The trial court further noted that Father failed to show "progress with respect to the limitations on his ability to meet the basic needs of an infant or young child despite the services provided to him during supervised visits." *Id.* at 12-13.

The trial court's factual findings are supported by the record, and the findings support the trial court's conclusion that Father had a continued incapacity that caused Child to be without parental care, control or subsistence, and that the cause of the incapacity could not be remedied. The trial court did not abuse its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(2).

*In re S.A.M.*, 195 A.3d 1026, at *4-5 (Pa. Super. 2018) (unpublished memorandum).

In the instant case, the situation remains almost exactly the same as it did in January 2018 when Father's rights to S.A.M. were terminated, and in August 2018, when the termination decree was affirmed. Father has continued to refuse to cooperate with CYS, has not shown that he is treating his psychological and medical conditions, and has not progressed with respect to the limitations on his ability to meet the basic needs of an infant. Due to the aggravated circumstances order, CYS was not required to provide reunification services to him, despite the fact that they were offered with respect to Father's oldest child. *See also In re D.C.D.*, 105 A.3d 662, 672

- 11 -

(Pa. 2014) (noting that reasonable reunification efforts are unnecessary to support termination of parental rights pursuant to Section 2511(a)(2) and (b)).

Accordingly, we discern no error in the orphans' court's finding that competent, clear, and convincing evidence supported the termination of Father's parental rights pursuant to Section 2511(a)(2), based upon his continued incapacity – his status as a registered sex offender, his inability to meet the basic needs of an infant, and his failure to provide proof he is treating his psychological and medical conditions – that resulted in Child being without essential parental care, the cause of which "cannot or will not be remedied." *See Lilley*, 719 A.2d at 330; *Z.P.*, 994 A.2d at 1117.

Next, we must consider whether Child's needs and welfare will be met by termination pursuant to Subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental

- 12 -

ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Additionally, the court may emphasize the safety needs of a child. *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). Where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists. *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Here, Father argues that the court erred in terminating his parental rights because there was insufficient evidence that termination best suited the needs and welfare of Child. *See* Father's Brief at 8-9. Father contends that the evidence established a bond between Child and Father, and that no bonding analysis was conducted. *Id.* Father seems to imply that the court did not consider the parent/child bond in rendering its decision. *Id.* at 9.

Initially, we note that Father's characterization of the evidence and the court's analysis is inaccurate. In the instant case, the court observed that:

> In addition to assistance from [CYS], the foster mother has facilitated contact and visits between [Child] and Mother and Father. Nevertheless, there is no evidence of a reciprocal bond between Father and [Child]. Thus, the [c]ourt determined that the termination of Father's parental rights would not destroy an existing relationship necessary and beneficial for the child.

*See* Trial Court Opinion, 10/16/18, at 14-15. The record supports this conclusion. Child has been in care since her birth; she knows Father only through supervised visitation in tandem with her sister, S.A.M., biweekly for one hour at a time. During these visits, Father is unable to physically hold or care for Child. Child does not look to Father for her needs during visits, but to her foster mother. She does not refer to Father as "dad" or any other specific name. Ms. Taylor testified that Child does not know Father as her father at this time. Father denied this, and testified that Child does call him "daddy" because S.A.M. calls him "daddy." Regardless, there is no other evidence of record to support the contention that any kind of bond exists between Father and Child. *See K.Z.S.*, 946 A.2d at 763 (where there is no evidence of a bond, it is reasonable to assume no bond exists).

In contrast, the orphans' court observed

> [Child] is developing well in her foster home and was on track developmentally at the time of the August, 2018 hearing. She was walking and beginning to talk at that time. [Child] has a very good relationship with her foster mother. [Child] calls her foster mother "Mama" or "Mom" and looks to her for guidance and when she needs something. [Child's] foster mother has facilitated supervised visits with Mother and Father. During the visits, when

- 14 -

[Child] was distressed or needed comfort, she went to her foster mother support instead of Father (or Mother). [Child's] foster mother has provided for her physical and emotional needs since her discharge from the hospital just after her birth. [Child] is bonded with her full biological siblings, with whom she has lived since being released from the hospital following her birth. [Child] has also bonded with the other two children in her foster mother's home. [Child's] foster home is the only home she has ever known.

*See* Trial Court Opinion, 10/16/18, at 9-10 (citations to the record omitted). Accordingly, the court concluded that it was in Child's best interests to remain in her foster home, where she could achieve stability, permanency, and where her physical and emotional needs were met.

We discern no abuse of discretion in that conclusion. Accordingly, clear and convincing evidence supports the orphans' court's termination of Father's parental rights under Sections 2511(a)(2) as well as the Section 2511(b) findings that there was no bond between Father and Child, and that adoption would best serve Child's needs and welfare. *See Z.P.*, 994 A.2d at 1126-27; *K.Z.S.*, 946 A.2d at 763.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/13/2019